IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HILLARY M. BURGESS, | : | CIVIL ACTION |
| **Plaintiff,** | : | |
| | : | |
| vs. | : | NO.    21-cv-1584 |
| | : | |
| KILOLO KIJAKAZI, | : | |
| **Acting Commissioner of Social Security,** | : | |
| **Defendant.** | : | |

**MEMORANDUM OPINION**

**LYNNE A. SITARSKI**
**UNITED STATES MAGISTRATE JUDGE**                         December 19, 2022

Plaintiff Hillary M. Burgess brought this action seeking review of the Acting Commissioner of Social Security Administration's (Acting Commissioner) decision denying her claim for Social Security Disability Insurance (SSDI) benefits and Supplemental Security Income (SSI) benefits under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401–433, 1381–1383f.  This matter is before me for disposition upon consent of the parties.  For the reasons set forth below, Plaintiff's Request for Review (ECF No. 10) is **GRANTED**, and the matter is remanded for further proceedings consistent with this memorandum.

I.      PROCEDURAL HISTORY

Plaintiff protectively filed for SSDI and SSI, alleging disability since October 1, 2015, due to major depressive disorder, generalized anxiety disorder, chronic headaches and migraines, sleep disorder, "very introverted," "reclusive," eczema, and allergies.  (R. 244).  Plaintiff's applications were denied at the initial level, and Plaintiff requested a hearing before an Administrative Law Judge (ALJ).  (R. 92-93, 104).  A vocational expert (VE) testified at the September 4, 2019 administrative hearing.  (R. 59-65).  Plaintiff was unable to appear due to a

transportation issue, and the ALJ issued a notice to show cause why the matter should not be dismissed.  (R. 61-62).  After Plaintiff filed a response on September 25, 2019, a second hearing was held on January 9, 2020, at which Plaintiff, represented by counsel, and a VE testified.  (R. 33-58).  On February 4, 2020, the ALJ issued a decision unfavorable to Plaintiff.  (R. 13-32). Plaintiff appealed the ALJ's decision, and the Appeals Council denied Plaintiff's request for review on February 2, 2021, thus making the ALJ's decision the final decision of the Acting Commissioner for purposes of judicial review.  (R. 1-6).

On April 2, 2021, Plaintiff filed a complaint in the United States District Court for the Eastern District of Pennsylvania.  (Compl., ECF No. 1).  On April 26, 2021, Plaintiff consented to my jurisdiction. (Consent Order, ECF No. 4).  On December 2, 2021, Plaintiff filed a Brief and Statement of Issues in Support of Request for Review.  (Pl.'s Br., ECF No. 10).  On February 2, 2022, the Acting Commissioner filed a Response, and on February 16, 2022, Plaintiff filed a Reply.  (Resp., ECF No. 11; Reply, ECF No. 12).

## II.    FACTUAL BACKGROUND[1]

The Court has considered the administrative record and summarizes the evidence relevant to the instant request for review.  Plaintiff completed high school.  (R. 245).  She previously worked at a concession stand in a movie theater and as a crew member at a fast food restaurant. (R. 245).

---

[1]  Because the Court's ruling in this matter implicates only the ALJ's analysis at step three of the five-step sequential evaluation, regarding whether Plaintiff's mental impairments meet the criteria for Listing 12.04 (depressive, bipolar and related disorders) or Listing 12.06 (anxiety and obsessive-compulsive disorders), the Court summarizes only the evidence relevant to these listings.

### A.      Medical Evidence

Plaintiff first presented to Lance Wilson, M.D., on November 9, 2012, for anxiety, depression and migraine headaches.  (R. 461).  Many of the subsequent visits with his office through 2019 relate to treatment of illnesses and allergies, gynecological care, a sleep study, and medication management, although the records also contain references to Plaintiff's mental health conditions.  (R. 338-93, 467-650).  For example, at a May 3, 2013 visit, Plaintiff reported "having difficulty functioning around other people" and that she was "used to being by herself."  (R. 498).  She indicated that she was "agitated in a busy environment" and "has panic attacks in those situations."  (R. 498).  On May 27, 2016, Dr. Wilson noted "[o]ngoing depression and anxiety," "[w]hen [she] talks about being depressed she starts crying," and that her headaches were associated with stress.  (R. 356).  He further recorded that "pt has tried many antidepressants and either didn't tolerate them or they were ineffective."  (*Id.*; *see also* R. 387 ("Feels anxiety/depression the same as before escitalopram"); R. 498 ("no better with increased effexor")).  On April 5, 2018, Plaintiff described "paralyzing anxiety when driving."  (R. 376).

On September 9, 2013, consultative psychologist Carmelita Lewis, Ph.D., examined Plaintiff.  (R. 321-24).  Plaintiff was working part-time at McDonald's at the time.  (R. 321).  Dr. Lewis noted a diagnosis for depression with symptoms of lethargy, hopelessness, helplessness, crying, irritability, emotional lability, outbursts of yelling, avoidance and suspicion of others, pessimism, decreased appetite, and lack of motivation and energy.  (R. 322-23).  Plaintiff also reported nervousness, being "shaky," upsetting easily, excessive worry, hyperventilation and panic attacks with associated rapid pulse and chest pain and tightness.  (*Id.*).  Mental status examination results were largely normal but with initial nervousness, mildly impaired concentration, and fair judgment and insight.  (*Id.*).

On April 2, 2018, Dr. Wilson completed a form Disability Certification in which he

recorded that Plaintiff had the following functional disability: "Chronic depression w/anxiety and chronic migraines. Anxiety and headaches preclude pt from driving." (R. 327). He indicated that the disability was permanent[2] and that Plaintiff did not require the assistance of an escort, but also that Plaintiff could not use public transportation even with the assistance of an escort. (*Id.*). In an attached progress note dated November 9, 2012, Dr. Wilson stated that Plaintiff had suffered from anxiety and depression for the prior eight years and that she had a lack of motivation, was chronically tired, and "prefer[red] to isolate." (R. 328). He indicated that she had been on Zoloft but that it had recently made her irritable. (*Id.*). He further observed that she "gets sweats" from anxiety and "[s]huts down when overwhelmed." (*Id.*).

On June 14, 2018, Plaintiff presented to Penndel Mental Health Center at the suggestion of Dr. Wilson for a psychiatric evaluation by Ying Wang, M.D., with chief complaints of anxiety and depressed mood. (R. 399). Symptoms included no interest, self-isolation, worsening anxiety, excessive worry, racing thoughts, and low mood, motivation and energy. (*Id.*). It was noted that she had never received psychiatric treatment other than medications. (*Id.*). Plaintiff was started on Lexapro. (R. 400). She returned in July 2018 for a follow up, at which time Dr. Wang noted the Lexapro was "[o]verall well tolerated." (R. 397). At a November 9, 2018 visit Plaintiff was "overall stable" and reported that her mood was "slightly improved and she [was] actively working on not letting things get to her too much," although she continued to have "occasional irritability" and overthink things. (R. 401). Plaintiff's Lexapro dosage was increased and Dr. Wang noted: "pt. appears highly anxious/analytical, not sure if she will indeed go with higher dose." (R. 405). At the next visit, in December 2018, Plaintiff reported not

---

[2] In an attached form, Dr. Wilson stated that Plaintiff had been disabled since May 3, 2013, and that her disability was expected to last until April 2, 2019, one year after the date on which he had completed the form. (R. 326).

feeling differently from the increased dose and refused a further dosage increase.  (R. 408).  In February 2019, she reported being "stressed out" but "not overly depressed" and that she was not taking any medications due to her further sleep study testing.  (R. 453-54).  In August 2019, Plaintiff was "highly anxious" about her disability paperwork and became tearful with rapid speech when discussing her desire to go back to school and eventually find meaningful work. (R. 668).  She also reported low self-esteem and a desire to contribute financially to her household.  (*Id.*).  Plaintiff's mental examination results from these visits were generally normal. (R. 398, 400, 405, 408, 455, 669).

On January 28, 2019, State agency psychologist John Gavazzi, Psy.D., determined that Plaintiff had moderate limitations in her ability to understand, remember and carry out detailed instructions, to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, and to respond appropriately to changes in work setting, but that she was not significantly limited in any other area of mental functioning.  (R. 74-76, 87-89).

On July 12, 2019, Plaintiff typed a lengthy list of diagnoses, associated symptoms, and accommodations that she and her healthcare providers allegedly believed were necessary for her to work.  (R. 654-57).  Listed diagnoses included "persistent/chronic depression," anxiety, and low energy and fatigue, which Plaintiff attributed to an unspecified "sleep disorder."  (R. 654). Some of Plaintiff's reported symptoms were self-consciousness, lack of self-confidence and self-worth, guilt, remorsefulness, reclusiveness, irritability, pessimism, excessive worry and apprehension, hopelessness, feeling overwhelmed and stressed out, indecision, germaphobia, lack of interest or meaning, hormonal imbalance, excitability, lethargy, sleep irregularities, bad dreams, procrastination, nausea, appetite changes, hyperventilation and hypoventilation, crying spells, inability to maintain a routine, inability to cope, and difficulty learning.  (R. 654-56).

Plaintiff claimed that the following accommodations, among others, were necessary for her to work: a flexible or limited schedule regarding length and number of shifts, modified breaks, counseling and therapy, various "work-based assists" (such as job coaches, written instructions, extra training, task separation and extra time to complete tasks), and the ability to work remotely. (R. 657-58).  Dr. Wilson reviewed and signed the list on July 12, 2019, and on August 19, 2019, Jennifer Dagia, Psy.D, LCSW, and Dr. Wang also reviewed and signed it.  (R. 658). Additionally, Dr. Wang wrote: "Revised to suggest: -- 20 minute break after every 3 HR shift. – Ability to work remotely."  (*Id.*).  The list further includes the following two handwritten notes: "Limited HRs per days or longer hrs w/ longer breaks" and "may need to vary depending on condition."  (R. 657).

On August 19, 2019, Dr. Wang wrote a to-whom-it-may-concern letter stating that she was treating Plaintiff for "major depressive disorder, recurrent, moderate, and generalized anxiety disorder" with present symptoms of "anxiety, worried ruminations, low mood, low energy, lack of motivation and low self-esteem."  (R. 660).  She noted that although Plaintiff had briefly been on Lexapro, she chose to discontinue all psychotropic drugs to avoid interfering with her upcoming sleep study.  (*Id.*).  He indicated that he had met with Plaintiff "a total of 3 times in 2019 (to review result of sleep study and to discuss possible medication alternatives and future treatment direction)" but that he was "not able to render an accurate assessment of her capacity to work due to [their] limited interactions to date."  (*Id.*).  He further stated: "I do think, however, that given her ongoing symptoms, she would have a greater chance of success if she is given accommodations for frequent breaks (20 minutes after 3 hour shifts based on her past experience) and flexible hours in a work situation."  (*Id.*).

On August 21, 2019, Dr. Dagia wrote a to-whom-it-may-concern letter identifying herself as the supervisor of Plaintiff's primary therapist, noting that Plaintiff had attended weekly

individual therapy sessions at Penndel between November 2018 and June 2019 for her pervasive depressive disorder and generalized anxiety disorder, and explaining that she (Dr. Dagia) was writing the letter because Plaintiff's primary therapist had left Penndel and Plaintiff was awaiting a new one. (R. 659). Dr. Dagia stated in the letter that she was familiar with Plaintiff's symptoms and presentation. (*Id.*). She opined that Plaintiff had marked limitations in the ability to understand, remember or apply information; to interact with others; to concentrate, persist, or maintain pace; and to adapt or manage herself due to her loss of interest, sleep disturbances, feelings of guilt and worthlessness, difficulty concentrating, diminished energy, and restlessness, fatigue, irritability. (*Id.*).

On September 3, 2019, Dr. Wilson offered a "Physical Medical Opinion." (R. 661-64). In relevant part, Dr. Wilson stated that he had seen Plaintiff every one to four months since November 2012 and that her diagnoses included depression with anxiety, chronic headaches, and chronic fatigue. (R. 661). He assessed her prognosis as fair to good. (*Id.*). Identified symptoms included pain, dizziness and fatigue. (*Id.*). Dr. Wilson observed:

> Patient is in a constant depressed mood and gets episodic exacerbations of 2-3 days when is [sic] worse with symptoms of being withdrawn very irritable and bed ridden. She is also in a steady state of anxiousness with constant worry which is easily exacerbated by stressful events. She feels fatigued approximately 4-5 days a week which affects her functionality and ability to do ADL's [activities of daily living] and IADL's [instrumental activities of daily living]. She also experiences headaches several days a week that exacerbates her other symptoms of depression, anxiety and fatigue.

(*Id.*).

Dr. Wilson noted that Plaintiff "has been tried on a wide variety of medications for treatment of depression[.] She last took Lexapro which was not [e]ffective. She is current[ly] be[ing] evaluated by psychiatrist for new treatment." (*Id.*). He predicted that Plaintiff's impairments would last longer than 12 months and that she would miss approximately three days

of work per month.  (R. 662-63).  He indicated that to work full-time she may require a low noise

environment, alternative lighting and no "confining work space."  (R. 663).  He stated that her

physical condition was worsened by her depression, anxiety and low stress tolerance.  (R. 662-

63).  Dr. Wilson wrote that his opinions were based on "longitudinal perspective-experience with

the patient over many years of treating the patient, consistency of patient's complaints over time

and patient's response to treatment or lack thereof."  (R. 663).  He elaborated: "Having treated

the patient for 7 years I know her well and feel that her condition will not likely improve to a

degree that she can tolerate an 8 hour work day or be able to work 5 consecutive days.  She has a

lifelong problem with depression and fatigue that is probably irremediable."  (R. 664).

### B.    Non-medical Evidence

The record also contains non-medical evidence.  On January 18, 2019, Plaintiff

completed an Adult Function Report.  (R. 252-66).  She reported living with her boyfriend and

his father.  (R. 253).  According to the report, she suffers from fatigue, low energy, sleep

irregularities, bad dreams and anxiety.  (R. 253-54, 261).  She spends her days reading, surfing

the internet, drafting documents and notes, watching media videos and livestreams, coding,

listening to music, using educational applications on her phone, playing video games, playing

with and taking care of her cat, spending time with her boyfriend, sometimes doing simple house

chores (such as laundry, cleaning and vacuuming), preparing simple meals, and napping.  (R.

254-55, 257).  She can generally engage in personal care except when she "do[es]n't feel up to

it."  (*Id.*).  She requires reminders to take medications.  (R. 255).  She has a driver's license but

does not drive due to anxiety, headaches, and a lack of vehicle and experience.  (R. 256).

Plaintiff can shop in stores and on the computer and manage and count money.  (*Id.*).  She does

not go out socially but talks to her parents on the phone on a regular basis.  (R. 257).  She has

problems getting along with others (although not with authority figures) and describes herself as

introverted, reclusive, short-tempered, irritable, and easily vexed.  (R. 258-59, 261-64, 266).  She handles stress "terribly."  (R. 259).  She has problems with memory, completing taskings, concentration, understanding and following instructions.  (R. 258, 265-66).  She generally finishes what she starts and is "okay" at following written and spoken instructions.  (*Id.*).

Plaintiff also testified at the administrative hearing on January 9, 2020.  According to her testimony, she relies on medical transport and her caseworker to get to appointments, and her caseworker drove her to the hearing.  (R. 37).  When asked why she was unable to work full-time, Plaintiff cited her "very low energy," "depression and anxiety," and migraine headaches.  (R. 37, 52).  She reported being able to go to out as needed, such as to the grocery store and appointments, but claimed to have difficulty "stay[ing] on track" with house chores.  (R. 39).  Plaintiff moved to the area from Louisiana in 2009 and does "not really" have friends here.  (R. 41).  Her hobbies include working with language books (approximately 30 to 40 minutes at a time) and playing video games (sometimes for a few hours at a time).  (R. 41, 47-48).  She attended college "very briefly" but stopped due to depression and anxiety.  (R. 42).  She also worked full-time at McDonald's but, due to her symptoms, changed to part-time then resigned.  (R. 49).  She stays in bed at least a portion of the day two to three times per week due to depression and is sometimes withdrawn due to anxiety.  (R. 44).  She has zero to one day per week where she has no symptoms from her anxiety, depression or other ailments.  (R. 46).  She expressed a desire to avoid coworkers and predicted that she would miss "[a]t least two or three days per week" due to her conditions.  (R. 53-54).

## III.    ALJ'S DECISION

Following the administrative hearing held on January 9, 2020, the ALJ issued a decision in which she made the following findings:

1.    The claimant meets the insured status requirements of the Social Security Act

      through June 30, 2019.

2.    The claimant has not engaged in substantial gainful activity since October 1,

      2015, the alleged onset date.

3.    The claimant has the following severe impairments: depressive disorder, anxiety

      disorder, migraine and/or tension headaches; and somatic symptom disorder.

4.    The claimant does not have an impairment or combination of impairments that

      meets or medically equals the severity of one of the listed impairments in 20 CFR

      Part 404, Subpart P, Appendix 1.

5.    After careful consideration of the entire record, the undersigned finds that the

      claimant has the residual functional capacity to perform light work as defined in

      20 CFR 404.1567(a) and 416.967(a) except [it] should involve: simple, routine

      tasks, and simple judgment and decision-making; no contact with the general

      public, occasional contact with coworkers, and occasional interaction with

      supervisors.  The claimant cannot drive as part of her job duties.  She is able to

      perform work that is as self-paced as possible, meaning that production criteria

      can be made-up by the end of the workday.  After working two hours, the

      claimant will need a 10-minute break, which can include normal work breaks.

      The claimant can tolerate a moderate noise level.

6.    The claimant has no past relevant work.

7.    The claimant was born on July 25, 1991 and was 24 years old, which is defined as

      a younger individual age 18-44, on the alleged disability onset date.

8.    The claimant has at least a high school education and is able to communicate in

      English.

9.     Transferability of job skills is not an issue because the claimant does not have past relevant work.

10.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11.    The claimant has not been under a disability, as defined in the Social Security Act, from October 1, 2015, through the date of this decision.

(R. 13-32).  Accordingly, the ALJ found Plaintiff was not disabled.  (R. 28).


## IV.    LEGAL STANDARD

To be eligible for benefits under the Social Security Act, a claimant must demonstrate to the Commissioner that he cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months.  42 U.S.C. § 1382c(a)(3)(A).  A five-step sequential analysis is used to evaluate a disability claim:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.  If she is not, then the Commissioner considers in the second step whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to perform basic work activities.  If the claimant suffers a severe impairment, the third inquiry is whether, based on the medical evidence, the impairment meets the criteria of the impairment listed in the "listing of impairments," . . . which result in a presumption of disability, or whether the claimant retains the capacity to work.  If the impairment does not meet the criteria for a listed impairment, then the Commissioner assesses in the fourth step whether, despite the severe impairment, the claimant has the residual functional capacity to perform her past work.  If the claimant cannot perform her past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

*Sykes v. Apfel*, 228 F.3d 259, 262-63 (3d Cir. 2000); *see also* 20 C.F.R. §§ 404.1520(a)(4),

416.920(a)(4). The disability claimant bears the burden of establishing steps one through four. If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner at step five to establish that, given the claimant's age, education, work experience, and mental and physical limitations, he is able to perform substantial gainful activities in jobs existing in the national economy. *Poulos v. Comm'r. of Soc. Sec.*, 474 F.3d 88, 92 (3d Cir. 2007).

Judicial review of a final decision of the Commissioner is limited. A district court is bound by the factual findings of the Commissioner if they are supported by substantial evidence and decided according to correct legal standards. *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence is "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate." *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 118 (3d Cir. 2000) (citations omitted). Even if the record could support a contrary conclusion, the decision of the ALJ will not be overruled as long as there is substantial evidence to support it. *Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986). The court has plenary review of legal issues. *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999).

## V.     DISCUSSION

In her request for review, Plaintiff raises four claims[3]:

> I. The Commissioner under whom the ALJ issued the final decision served a longer term than the President and was removable only for cause, in violation of the separation of powers; therefore, the decision is constitutionally defective and should be reversed.

> II. The ALJ erroneously dismissed the treating psychologist as not being a treating source, and improperly evaluated her opinion that

---

[3] The Court sets forth and considers Plaintiff's arguments in the order corresponding to the five-step sequential analysis.

12

Ms. Burgess satisfied "B" listing criteria.

III. The ALJ rejected the opinion of the treating physician for erroneous reasons, in violation of the regulations and the law of this circuit.

IV. The ALJ failed to include all of Plaintiff's credibly established limitations in her RFC and hypothetical question to the vocational expert.

(Pl.'s Br., ECF No. 10, at 4-29).

### A.    Separation of Powers Argument

Relying upon the Supreme Court's ruling in *Seila Law LLC v. CFPB*, Plaintiff submits that the structure of the Social Security Administration is an unconstitutional violation of the separation of powers because its head serves for a longer term than the President (six years) but can only be removed by the President for cause ("neglect of duty or malfeasance in office"). (Pl.'s Br., ECF No. 10, at 4-6 (citing __ U.S. __, 140 S. Ct. 2183 (2020); 42 U.S.C. § 902(a)(3))). She contends that she was deprived of a valid administrative proceeding because former Commissioner Andrew Saul's promulgation of controlling regulations under which the case was decided, as well as his delegation of authority to the presiding ALJ, were constitutionally defective. (*Id.* at 5-6). She therefore requests that the ALJ's decision be reversed. (*Id.* at 6).

In response, the Acting Commissioner agrees that Section 902(a)(3) violates the separation of powers but insists that that fact alone does not warrant setting aside a denial of disability benefits. (Resp., ECF No. 13, at 5). Citing the Supreme Court case of *Collins v. Yellen*, she asserts that Plaintiff cannot show the required nexus between the provision and the denial of her claim for two reasons. (*Id.* at 6 (citing 141 S. Ct. 1761 (2021))). First, she maintains that "the deciding ALJ served under a ratification of her appointment by an Acting Commissioner not subject to Tenure Protection, thus severing any nexus between the removal restriction and Plaintiff's alleged harm." (*Id.* at 7-9). Second, she submits that Plaintiff is unable

to show that Section 902(a)(3) caused the denial of her benefits claim as required by *Collins*. (*Id.* at 9-13).  On this point, she observes that unlike instances in which an agency official lacks proper authority to occupy an office due to a violation of the Appointments Clause, "agency action is not *per se* invalid simply because it can be traced back to an official subject to an unconstitutional *removal* protection." (*Id.* at 9 (citing *Lucia*, 138 S. Ct. 2044 (emphasis in original))).  Instead, she argues that under *Collins* there can be no argument that the official exercised power he or she did not lawfully possess as long as the official was properly appointed. (*Id.* at 9).  Thus, in the Acting Commissioner's view, Plaintiff can succeed on her removal challenge only if the injuries were caused by an official subject to the removal restrictions *and* the restrictions themselves "inflict[ed] compensable harm" upon Plaintiff.  (*Id.* at 10 (quoting *Collins*, 141 S. Ct. at 1789)).  This showing, the Acting Commissioner insists, Plaintiff has not made.  (*Id.* at 9-13).

As a separate argument, the Acting Commissioner posits that Plaintiff's request for a new administrative hearing should be denied under the harmless error doctrine, the de facto officer doctrine, the rule of necessity and "broad prudential considerations."  (Resp., ECF No. 13, at 13-17).  In her reply, Plaintiff counters that these "other arguments" are not persuasive.  (Reply, ECF No. 14, at 21-22).

Plaintiff further replies that she does not challenge the validity of the ALJ's appointment but rather the delegation of authority by Commissioner Saul because she "was subject to the unconstitutional removal protection at the time of th[e] decision."  (Reply, ECF No. 14, at 15).  She insists that notwithstanding the Acting Commissioner's subsequent ratification of the ALJ's appointment, she derived her authority to issue her decision from Commissioner Saul, rendering it constitutionally defective.  (*Id.* at 15-16).  Next, she counters that "harm is presumed" because the matter involves government officials exercising authority that they did not lawfully possess

14

in violation of the separation of powers.  (*Id.* at 16-18 (citing *Collins*, 141 S.Ct. at 1788; *Carr*, 141 S. Ct. at 1356-62; *Cirko v. Comm'r of Soc. Sec.*, 948 F.3d 148, 153-54 (3d Cir. 2020))).  She continues that even if a causal connection is not presumed, she has satisfied this requirement because without the illegal delegation of authority the ALJ and Appeals Council could not have issued their unfavorable determinations.  (*Id.* at 18).  In fact, she argues that the ALJ and Commissioner Saul share "an identity relationship" such that the decision of the ALJ is the decision of the Commissioner pursuant to 42 U.S.C. § 405(b)(1).  (*Id.* at 19).

In *Seila Law*, the United States Supreme Court found that a violation of the constitutional separation of powers occurs when an executive agency is led by a single head who serves for a longer term than the president and can only be removed from that position for cause.  140 S. Ct. 2183.  The Acting Commissioner agrees that the relevant provision of the Social Security Act, 42 § U.S.C. § 902(a)(3), violates the separation of powers to the extent that it limits the President's authority to remove the Commissioner without cause. (Resp., ECF No. 13, at 5).  However, the Acting Commissioner argues that this alone does not support setting aside Plaintiff's unfavorable disability determination because Plaintiff cannot show that the restriction actually caused her harm.  (*Id.* at 6).

In 2021, the Supreme Court clarified its holding in *Seila* in *Collins v. Yellen*, 141 S. Ct. 1761.  In *Collins*, the Court held that an unconstitutional removal provision does not automatically render all actions taken by individuals subject to that provision void.  *Id.* at 1787. The court explained:

> Although the statute unconstitutionally limited the President's authority to remove the [individual], there was no constitutional defect in the statutorily prescribed method of appointment to that office. As a result, there is no reason to regard any of the actions taken by the [agency] as void.

*Id.* (emphasis in original).  However, the court also found that "it is still possible for an

unconstitutional provision to inflict compensable harm." *Id.* at 1789.  In such a case, the plaintiff must show that the removal restriction was the cause of the harm he suffered.  *Id.*  In the context of Social Security appeals, "*Collins* requires [the plaintiff] to demonstrate a nexus between the decision denying [his] disability benefits and 42 U.S.C. § 902(a)(3)."  *Andino v. Kijakazi*, No. 21-2852, 2022 WL 1135010, at *7 (E.D. Pa. 2022).

Notably, post-*Collins*, all the courts in this circuit that have considered such separation of powers arguments as the one raised here by Plaintiff have agreed, citing *Collins*, that they do not warrant remand.  *See, e.g., Andino*, 2022 WL 1135010; *Adams v. Kijakazi*, No. 20-3591, 2022 WL 767806, at *9-11 (E.D. Pa. Apr. 18, 2022); *High v. Kijakazi*, No. 20-3528, 2022 WL 394750, at *6 (E.D. Pa. Feb. 9, 2022); *Wicker v. Kijakazi*, No. 20-4771, 2022 WL 267896, at *8-10 (E.D. Pa. Jan. 28, 2022); *Mor v. Kijakazi*, No. 21-1730, 2022 WL 73510 (D.N.J. Jan. 7, 2022); *Crossley v. Kijakazi*, No. 20-2298, 2021 WL 6197783, at *8 (M.D. Pa. Dec. 31, 2021). Courts in other circuits have also reached the same conclusion.  *See, e.g. Shannon R. v. Comm'r of Soc. Sec.*, 572 F. Supp. 3d 1028, 1037-39 (W.D. Wash. 2021); *Alice T. v. Kijakazi*, No. 8:21CV14, 2021 WL 5302141, at *18 (D. Neb. Nov. 15, 2021); *Webb v. Kijakazi*, No. 1:20CV714, 2021 WL 5206498, at *15 at n. 12 (M.D.N.C. Nov. 9, 2021) (Report and Recommendation); *Lisa Y. v. Comm'r of Soc. Sec.*, 570 F. Supp. 3d 993 (W.D. Wash. 2021); *Robinson v. Kijakazi*, No. 1:20-CV-00358-KDB, 2021 WL 4998397, at *2-3 (W.D.N.C. Oct. 27, 2021); *Tracey Ann. P. v. Kijakazi*, No. 20CV1163-LAB(RBB), 2021 WL 4993021, at *18 (S.D. Cal. Oct. 27, 2021) (Report and Recommendation); *Robles v. Comm'r of Soc. Sec.*, No. 220CV01069JDPSS, 2021 WL 4285170, at *4 n. 6 (E.D. Cal. Sept. 21, 2021); *Angelita O. v. Kijakazi*, No. 1:20-CV-00034-AJB, 2021 WL 4146085, at *18 at n. 13 (N.D. Ga. Sept. 13, 2021).

Here, Plaintiff has not shown a nexus between the decision denying her disability benefits

and Section 902(a)(3).  Citing cases involving violations of the Appointments Clause, she argues the ALJ lacked authority to preside over her case and that she is entitled to a new hearing with a constitutionally appointed ALJ.  (Reply, ECF No. 14, at 17-18).  However, as explained in *Collins*, an unconstitutional restriction upon the President's authority to *remove* an agency officer does not create a constitutional defect in the officer's *appointment* such that his or her actions are rendered void, unlike with a violation of the Appointments Clause.  141 S. Ct. at 1787; *cf. Lucia*, 138 S. Ct. at 2055 ("the appropriate remedy for an adjudication tainted with an appointments violation is a new hearing before a properly appointed official") (citing *Ryder v. United States*, 515 U.S. 177, 183, 188, 115 S. Ct. 2031, 132 L.Ed.2d 136 (1995)) (quotations omitted).

Plaintiff further argues that the adjudication of her claim by an ALJ delegated authority by a constitutionally defective Commissioner establishes a presumption of harm and that the ALJ and Appeals Council could not have issued the adverse determination in her case "but for" the Commissioner's unlawful delegation of authority to them.  (Reply, ECF No. 14, at 20). Nonetheless, the mere delegation of authority by the Commissioner does not constitute a sufficient nexus to satisfy the requirements of *Collins* or *Seila Law*.  In *Collins*, the injury suffered by the plaintiffs was directly traceable to an amendment adopted by the directors of the Federal Housing Finance Agency (FHFA) that materially changed the nature of certain financial agreements. 141 S. Ct. at 1774, 1779.  As a result, the plaintiffs in *Collins* had "an identifiable basis to contend that but for the unconstitutional removal provision, the President may have removed and appointed a different Director who would have disapproved of the adoption (or implementation) of the [amendment.]" *Lisa Y.*, 2021 WL 5177363, at *7.  But it is not enough for Plaintiff to trace her injury to the Commissioner's ability to delegate power to ALJs and to promulgate applicable rules and regulations; rather, she must be able to trace that injury to the

actual unlawful conduct in this matter, which is the unconstitutional removal clause.  *See Wicker*, 2022 WL 267896, at *10 (citing *Collins*, 141 S. Ct. at 1779).  Unlike the FHFA Director in *Collins*, the Commissioner did not promulgate a new action affecting or injuring Plaintiff, and there is nothing to indicate that but for the unconstitutional removal clause the President would have removed the Commissioner and appointed a new Commissioner who would have decided Plaintiff's disability claim *differently. See id.* (finding Commissioner's delegation of authority to ALJs and Appeals Council did not constitute sufficient nexus to demonstrate standing under *Collins*).  As a result, Plaintiff has failed to show that the unconstitutional removal clause caused her harm.[4]

Accordingly, remand on this basis is denied.

### B.   Listings at Step Three

Plaintiff contends that the ALJ erred at step three of the sequential analysis by improperly dismissing Dr. Dagia's conclusions that she has marked limitations in interacting with others and in adapting and managing herself and by erroneously determining that Dr. Dagia was not a treating source.  (Pl.'s Br., ECF No. 10, at 19-23).  The Acting Commissioner responds that substantial evidence supports the ALJ's evaluation of the opinion of Dr. Dagia and that she was merely the supervisor of the treating therapist, not a treating source herself.  (Resp., ECF No. 13, at 31-32).  Because I agree with Plaintiff that the ALJ did not properly articulate her consideration of the supportability and consistency of the opinion, whether or not Dr. Dagia should be viewed as a treating source, I remand the matter on this basis.

---

[4]  Because this Court agrees with the Acting Commissioner that Plaintiff's separation of powers argument fails due to Plaintiff's inability to show that the offending removal provision caused the denial of her claim, this Court does not address the Acting Commissioner's remaining arguments or Plaintiff's responses thereto.

At step three, the ALJ analyzes whether a claimant's impairments or combination of impairments meet or medically equal one of the listings that prevent an adult, regardless of age, education, or work experience, from performing any gainful activity.  20 C.F.R. §§ 404.1525(a), 416.925(a).  This inquiry functions to identify those claimants whose medical impairments are so severe they would be found disabled regardless of their vocational background, making further inquiry unnecessary.  *Sullivan v. Zebley,* 493 U.S. 521, 532 (1990).  The claimant bears the burden of producing medical findings showing her impairments meet or medically equal a listed impairment.  *See Burnett*, 220 F.3d at 120 n.2.  To meet this burden, the claimant must establish all the requirements of the relevant listing.  *Sullivan*, 493 U.S. at 530 (claimant who meets only some of the listing requirements, "no matter how severely, does not qualify"); *see also Hartung v. Colvin*, No. 12-6155, 2016 WL 2910096, at *5 (E.D. Pa. May 19, 2016).  Meeting a listing cannot be based on diagnoses alone.  20 C.F.R. §§ 404.1525(d) and 416.925(d).  Because matching or equaling a listing at step three results in an automatic finding of disability, the listings are strictly construed against claimants.  *See Sullivan*, 493 U.S. at 530-32.

Here, the ALJ identified Listings 12.04 (depressive, bipolar and related disorders) and 12.06 (anxiety and obsessive-compulsive disorders) as relevant to Plaintiff's mental health impairments, but found her impairments were not severe enough to meet the listing pursuant to the criteria of paragraph "B" because they did not cause "at least two 'marked' limitations or one 'extreme' limitation" in the relevant areas of mental functioning.  (R. 20).  Specifically, as relevant here, the ALJ determined that Plaintiff had a moderate limitation in interacting with others and a mild limitation in adapting or managing herself.[5]  (R. 20).

---

[5]  The ALJ also found that the paragraph "C" criteria were not satisfied.  (R. 21-22).  A claimant may satisfy the "C" criteria of Listings 12.04 or 12.06 by showing that the claimant's mental disorder is "serious and persistent;" that is, that the claimant has a medically documented history of the existence of the disorder over a period of two years, and there is evidence of both: (1) medical treatment, mental health therapy, psychosocial support, or a highly structured setting

Dr. Dagia's opinion reads in full:

> I am the supervisor of the primary therapist for Hillary Burgess, DOB 07/25/1991. Ms. Burgess was attending weekly individual therapy from November, 2018 through June, 20I9 for treatment related to her diagnoses of Pervasive Depressive Disorder and Generalized Anxiety Disorder. Unfortunately, her therapist left the agency and Ms. Burgess is currently on our waiting list for a new individual therapist.
>
> I have met with Ms. Burgess and am familiar with her symptoms and presentation. It is my professional opinion that the symptoms Ms. Burgess has been experiencing since her initial diagnosis of depression in 2004, are significant enough to impede her daily functioning. Ms. Burgess reports a loss of interest in all activities, sleep disturbance, feelings of guilt and worthlessness, difficulty concentrating, and decreased energy. These symptoms have led to marked limitation of activities of daily living as she has been unable to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage her thoughts and emotions.
>
> Additionally, with regards to anxiety, Ms. Burgess has consistently endorsed symptoms of restlessness; being easily fatigued; irritability; and sleep disturbance. Likewise, these symptoms have led to marked limitation of activities of daily living as she has been unable to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage herself.
>
> Due to the extent to which the symptoms severely limit her daily functioning, I believe that Ms. Burgess is unable to consistently perform the activities necessary in order to maintain gainful employment and her application for disability should be seriously considered.

(R. 659).

---

that is ongoing and that diminishes the symptoms and signs of the mental disorder, and (2) marginal adjustment; that is, minimal capacity to adapt to changes in the environment or to demands that are not already part of the claimant's daily life. 20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 12.04(C), 12.06(C). Plaintiff does not argue that the ALJ's paragraph "C" findings were in error. (Pl.'s Br., ECF No. 10, at 16-23).

The ALJ concluded regarding this opinion:

> This opinion is not persuasive.  Dr. Dagia indicated that she was the supervisor for the claimant's therapist, and had met the claimant on prior occasions, but does not describe what if any treating relationship she had with the claimant.  In addition to not being a treating source, Dr. Dagia does not provide support for the significant limitations she attributes to the claimant.

(R. 25).

As an initial matter, the parties dispute whether the ALJ properly classified Dr. Dagia as "not being a treating source."  But this issue is a red herring.  "The 'treating physician rule' or 'treating source rule' originates from the prior regulatory scheme [applicable to claims filed before March 27, 2017], under which, if the ALJ found that 'a treating source's medical opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, [the ALJ] will give it controlling weight." *Cheryl F. v. Kijakazi*, No. 3:20-cv-16052, 2022 WL 17155681, at *10 (D.N.J. Nov. 22, 2022) (citing 20 C.F.R. § 404.1527(c)(2)).  However, "[t]he new regulatory scheme [applicable to claims filed on or after March 27, 2017] instructs that the ALJ 'will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative finding(s), including those from [the claimant's] medical sources.'" *Id.* (citing 20 C.F.R. § 404.1520c(a)).

Under this new scheme, the ALJ must evaluate the persuasiveness of the opinion, whether from a treating source or not, pursuant to the five factors set forth in 20 C.F.R. §§ 404.1520c(c) and 419.920c(c).  *See Lawrence v. Comm'r of Soc. Sec.*, No. 3:21-cv-01239, 2022 WL 17093943, at *4 (M.D. Pa. Nov. 21, 2022) ("Rather than assigning weight to medical opinions, [an ALJ] will articulate how persuasive he or she finds the medical opinions.")

21

(citations and quotations omitted).  Among these five factors, supportability and consistency are the "most important."  20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2); *accord Lawrence*, 2022 WL 1709343, at *10.  "Therefore, [the ALJ] will explain how [he or she] considered the supportability and consistency factors for a medical source's medical opinions . . . in [the] determination or decision . . . ."  20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).  Plaintiff asserts that the ALJ failed to fulfill this responsibility.

Plaintiff is correct.  The ALJ's decision makes no reference whatsoever to the consistency of Dr. Dagia's opinion.  Regarding its supportability, the ALJ merely states that Dr. Dagia "does not provide support for the significant limitations she attributes to the claimant." (R. 25).  But, as Plaintiff observes, this statement disregards Dr. Dagia's reported familiarity with Plaintiff's presentation and symptoms of anhedonia, sleep disturbances, feelings of guilt and worthlessness, difficulty concentrating, decreased energy, restlessness, fatigue, and irritability. (*See id.*).  The Acting Commissioner claims that the ALJ appropriately discounted Dr. Dagia's findings because "Dr. Dagia does not have any treatment notes to reinforce her acceptance of Plaintiff's self-reports," but that is not the reason given by the ALJ in her decision.  (Resp., ECF No. 13, at 31).  Instead, the ALJ based her rejection of the opinion only on Dr. Dagia's purported failure to provide any "support" for it, but this rejection ignores the bases set forth in the opinion itself.  Further, although the ALJ's stated explanation is vague, it would be inappropriate to find that it encompasses the reason proffered by the Acting Commissioner – a lack of corroborating treatment notes – because in conducting its review the Court is limited to the explanation actually set forth in the ALJ's decision.  *Schuster v. Astrue*, 879 F. Supp. 2d 461, 466 (E.D. Pa. 2012) ("[t]he ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision; the Commissioner may not offer a post-hoc rationalization.") (internal quotations omitted).

For these reasons, this matter is remanded for the ALJ to articulate her consideration of the supportability and consistency[6] of Dr. Dagia's opinion and, as applicable, address any impact this consideration may have on her findings at step three or subsequent steps of the sequential analysis.

### C.        Plaintiff's Remaining Arguments

In Plaintiff's remaining issues raised, she asserts that the ALJ improperly rejected the opinion of Dr. Wilson, resulting in an erroneous RFC assessment at step four and, in turn, an improper determination at step five that Plaintiff was not disabled.  (*See* Pl.'s Br., ECF No. 10, at 6-16).  She further contends that at steps four and five the ALJ did not include all her credibly established limitations in, respectively, her RFC and the hypothetical posed to the VE.  (*Id.* at 24-25).  However, the Court need not decide at this time whether any of these issues – which would be addressed later in the five-step analysis – constitute a basis for remand.  If the ALJ determines on remand that the Plaintiff has met a listing at step three, no further analysis will be required. *Milliman v. Berryhill*, No. 16–1279–LPS–MPT, 2017 WL 3912830, at *8 (D. Del. Sept. 7, 2017) ("Analysis stops at this step where the objectively determinable impairment meets or medically equals one listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, because the claimant is considered disabled *per se*."); *see also Steininger v. Barnhart*, No. 04-5383, 2005 WL 2077375, at *4 (E.D. Pa. Aug. 24, 2005) (not addressing additional arguments because the ALJ may reverse his findings after remand).

---

[6] Specifically, Plaintiff maintains that Dr. Dagia's findings of marked limitations in interacting with others and in adapting or managing oneself are consistent with the records of Drs. Wang and Wilson, as well as Dr. Lewis's consultative examination results, and that if the ALJ had properly considered the consistency and supportability of Dr. Dagia's opinion she would have been compelled to conclude at step three that Plaintiff met the "B" criteria of the relevant listings.  (*See* Pl.'s Br., ECF No. 10, at 20-23).

**VI.     CONCLUSION**

For the foregoing reasons, I find that the ALJ erred by failing to articulate her consideration of the supportability and consistency of Dr. Dagia's opinion.  Accordingly, Plaintiff's request for review is **GRANTED** to the extent that it requests remand. This matter is remanded to the Acting Commissioner for further proceedings consistent with this memorandum.


BY THE COURT:

  /s/ Lynne A. Sitarski_____
LYNNE A. SITARSKI
United States Magistrate Judge